IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 SEP 25  PM 2: 35

CATHY WYATT HATLEY,                    }
                                       }        DISTRICT COURT
       Plaintiff,                      }        N.D. OF ALABAMA
                                       }
v.                                     }        CASE NO. CV 01-JEO-2768-M
                                       }
MOTION INDUSTRIES, INC.,               }
                                       }        **ENTERED**
       Defendant.                      }

                                                SEP 2 5 2003

## MEMORANDUM OPINION

Before the court is the motion for summary judgment of defendant Motion Industries,

Inc. (the "defendant"). (Doc. 26).[1] For the reasons set forth below, the court finds that the

defendant's motion for summary judgment is due to be granted.

### FACTUAL BACKGROUND[2]

This is an action under the Americans with Disabilities Act, 42 U.S.C. §§ 2101 *et seq.*

("ADA") and the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"). The plaintiff,

Cathy Wyatt Hatley ("Hatley" or the "plaintiff"), asserts that the defendant violated her rights

under the ADA when it allegedly terminated her because of her disability. The plaintiff also

alleges that the defendant violated the FLSA by failing to pay her overtime it owed her and

illegally retaliated against her after she requested an accommodation for her disability.

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court in the
court's record of the case.

[2]The facts set out below are gleaned from the parties' submissions and they are viewed in
a light most favorable to the non-moving party in the discussion section. They are the "facts for
summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator
U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co.
of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

41

### Plaintiff's Background and Employment with Defendant

The plaintiff began working for the defendant in February 1985 as a bookkeeper in the coding department, where she was responsible for entering data, giving account numbers for new credit, and setting up new accounts for Texas, Florida, South Carolina, and North Carolina. (Pl. dep. at 26-27).[3]  Plaintiff continued in this position until December 21, 1994, when she resigned to accept a job with Hannah Steel. (Pl. dep. at 31-32).  During this first period of employment with the defendant, which comprised nearly ten years, the plaintiff was supervised by one person, receiving satisfactory evaluations, and no written discipline.[4]  (Pl. dep. at 28-29; Pl. aff. at ¶ 2).[5]

The plaintiff reapplied for employment with the defendant on June 5, 1995, and was rehired as an accounts receivable bookkeeper in the accounts receivable department.  (Pl. dep. at 38).  At the time the plaintiff was rehired, the defendant was not aware of her medical conditions.  (Pl. aff. at ¶ 5).  The plaintiff's new supervisor was Debra Morton.  (Pl. dep. at 70). As accounts receivable bookkeeper, the plaintiff was responsible for keeping up with the payment stubs, matching payment stubs with invoices on the computer, and balancing account receivables on a daily basis.  (Pl. dep. at 39).  The plaintiff remained in this position until March 30, 1998, during which the plaintiff asserts that her performance was satisfactory and that she

---

[3]The plaintiff's deposition is located at document 33, exhibit 2.  Deposition excerpts are also found at document 26, exhibit 3.

[4]The plaintiff was orally counseled regarding her taking extended lunches and personal breaks and for making excessive personal phone calls and arriving late to work.  (Pl. dep. at 30, 80, 82).

[5]The plaintiff's affidavit is found at document 33, exhibit 1.

received no written discipline. (Pl. aff. at ¶ 2).

On March 30, 1998, the defendant moved the plaintiff to a Clerical II position in the fleet leasing department under Faye Sanders' supervision. (Pl. dep. at 71). She remained in the Clerical II position until May 26, 2000. (Pl. dep. at 71). The plaintiff asserts that her work as a Clerical II during this time was satisfactory and that she received only occasional verbal counseling. (Pl. aff. at ¶ 3). She acknowledges, however, that her work there was criticized and that she told the defendant that she wanted to return to a different department after her leave, which she did. (Pl. dep. at 85-87).

### Emergence of Plaintiff's Medical Problems and Resultant Leave

On May 21, 2000, the plaintiff suffered a grand mal seizure, during which she hit her head and bit her tongue, shortly after which she went on a leave of absence from work.[6] (Doc. 33 at Ex. 9). The defendant confirmed the plaintiff's leave by letter dated May 31, 2000, and indicated that she was eligible to be reinstated. (Polk at 22).[7]

On June 9, 2000, one of the plaintiff's physicians, George M. Harris, M.D., wrote to the defendant and stated his opinion that the seizures were stress-related and suggested that the plaintiff should return to work under a different supervisor. (Doc. 33 at Ex. 10). He stated that she needed her leave of absence to be extended from June 7, 2000, to June 29, 2000. (*Id.*). On August 2, 2000, another of the plaintiff's physicians, D. Randall Willis, M.D., D.O., wrote to the defendant and stated that, over the last five months, she had been to see him multiple times

---

[6]The plaintiff first suffered a seizure during her son's birth over 25 years ago. (Hatley at 129). She apparently did not suffer from further seizures until the one on May 21, 2000, which precipitated her leave of absence from employment.

[7]Polk's full deposition is located at document 33, exhibit 3.

with increasingly severe symptoms related to job stress and depression, and that "[s]he eventually developed a stress-related disorder." (Doc. 33 at Ex. 11). Willis also opined that the plaintiff needed an extended leave of absence from work and recommended re-evaluation in 90 days. (*Id.*).

On September 8, 2000, the plaintiff was referred to a neurologist, Dr. Robert Pearlman, due to her chronic neck pain and increased arthritic pain since her last seizure. (Pearlman dep. at 19).[8] On November 7, 2000, the plaintiff was referred to Dr. Stuart Tieszen for further neuropsychological evaluation. (Tieszen dep. at 16).[9] He diagnosed her with "a seizure disorder in addition to an anxiety disorder and depression" and prescribed Effexor, Xanax, and Depakote. (Tieszen at 23). In a subsequent consultation with Dr. Tieszen, the plaintiff discussed her need to move to a less stressful position upon her return to work, and Dr. Tieszen prescribed an anti-depressant for her. (Tieszen dep. at 23-24). After this consultation, Tieszen wrote a letter dated November 14, 2000, to the defendant, stating as follows:

> Cathy Wyatt Hatley has been under my care since November 7[th]. She was originally referred to me by Dr. Richard Azrin for evaluation and treatment. She has a diagnosis of a seizure disorder in addition to an anxiety disorder and depression. In my professional opinion Ms. Wyatt Hatley would be best suited in a non-hostile work environment with a low stress level and possibly no deadlines to meet. I feel that she can work and is currently on medications and functioning. She is capable of doing clerical work such as filing, using a computer, phone calls, and fax and copier machine use.
>
> Currently her medications are being adjusted and I anticipate that she will be able to return to work on December 4, 2000.

(Doc. 33 at Ex. 12).

---

[8]Pearlman's full deposition is located at document 33, exhibit 6.

[9]Tieszen's full deposition is located at document 33, exhibit 5.

4

The plaintiff claims that these problems affect her driving, sleeping, concentrating, and taking care of herself.  (Pl. Aff. at ¶ 4).

### Plaintiff Seeks Less Stressful Position Before Returning to Work

The plaintiff ultimately took an extended leave of absence from May 2000, until December 5, 2000.  (Pl. dep. at 71; Doc. 33 at Ex. 8).  During the leave, on October 23, 2000, the plaintiff contacted Elizabeth Polk, defendant's employee relations manager, to request that, upon her return to work, she be reassigned to a less stressful file clerk position in a department other than financing.  (Polk dep. at 35).  Polk informed the plaintiff that there was only one position available on her return – a bookkeeping position in accounts payable under the supervision of Jeri Peek – although she could not guarantee that it would still be open when the plaintiff returned.  (Polk dep. at 35, 39-40, 42, 54-55; Doc. 33 at Ex. 13).  Polk apparently was aware of, but did not mention, another available position – that of file clerk position in the accounts payable department, which possibly would have carried the plaintiff's former rate of pay.  (Polk dep. at 37-39).

On November 27, 2000, the plaintiff again spoke by telephone with Polk, who again told the plaintiff that she would be working for Jeri Peek in accounts payable as a bookkeeper.  (Polk dep. at 54-55).  The plaintiff reiterated to Polk that her doctor advised that she not be placed in a stressful job with deadlines.  (Polk. dep. at 51-52, 55; Doc. 33 at Ex. 14).  The plaintiff asked if there were filing jobs in accounts payable or accounts receivable, so that she could work in a less stressful environment with no deadlines, even if it meant a demotion.  (Polk dep. at 64).  Polk did not mention the file clerk job, which the plaintiff argues would have fulfilled the recommended job conditions that Dr. Tieszen had outlined for her.  (Polk dep. at 44-45, 55; Tieszen dep. at 33-35).

5

On November 30, 2000, the plaintiff called Polk a third time, concerned over the potential stress of her new assignment, and asked if she could be placed in a less stressful file clerk position.  Polk told the plaintiff in this conversation that the bookkeeping job was the only job available for her.  Polk also stated that the plaintiff had three choices: go back to work on the bookkeeping job in accounts payable, apply for long-term disability, or quit.  (Polk at 55; Doc. 33 at Ex. 15).

While the plaintiff was still on leave, Polk told Peek that the plaintiff would be assigned as a bookkeeper in her department upon her return.  (Peek dep. at 9).  At that time, Peek told Polk that there was a file clerk position open in her department, but Polk represented to Peek that the plaintiff had been offered the clerk position before accepting the bookkeeper position.  (Peek dep. at 9, 13, 17-18).

### Plaintiff's Return to Work and Subsequent Termination

The plaintiff returned to work on December 5, 2000, as a bookkeeper in accounts payable, which position entailed duties relating to bookkeeping, computer skills, and telephone skills.  (Peek dep. at 10).  From December 5 to December 11, 2000, Peek kept detailed notes on the plaintiff's daily job performance problems.  (Peek dep. at 23).  On December 11, 2000, Peek verbally warned the plaintiff about her data entry speed.  (Peek dep. at 36).  Afterward, the plaintiff's blood pressure increased and she was unable to go to work on December 14-15, 2000.  (Peek dep. at 31-32; Doc. 33 at Ex. 8).  The plaintiff worked on December 16-18, but did not work on December 21 because of inclement weather.  (Doc. 33 at Ex. 8).  She was out on Christmas holiday leave from December 22 to December 25.  (Doc. 33 at Ex. 8).  She was again out from December 26 to January 16, 2001, due to medical problems.  (Doc. 33 at Ex. 8).  Upon

6

the plaintiff's return, Peek testified, her work was the worst performance Peek had observed in

22 years of supervising the department.  (Peek dep. at 7, 20, 45-46).  In addition, after

exhausting all her available leave, the plaintiff had absences beyond the time allocated to her by

the defendant's policies.  (Polk dep. at 56, 58; Ex. 19).

The plaintiff returned to work on January 17, 2001, whereupon she was verbally

counseled by Polk and Peek regarding the daily quantity of invoices she was keying and the

absences she had incurred since returning from leave.  (Peek dep. at 34; Polk dep. at 57, 58;

Doc. 33 at Ex. 16).  The next day, on January 18, 2001, the plaintiff called Polk and left a voice

message that she would not be coming back to work.  The recording of the message states as

follows:

> "Message, sent Thursday, January 18[th], at 9:28 a.m.  Beth, this is Cathy Wyatt
> Hatley.  Under all the rules and stipulations and being counted and breaks and all
> this kind of stuff and being timed going to the bathroom and all that, I cannot
> stay in that kind of environment.  So I'm telling you now that I will not be back.
> And my attorneys will be in touch with you just as soon as possible.  Thank you
> very much, and thank you for all your kindness through the years.  Bye, bye."

(Pl. dep. at 106-07).

The plaintiff called Dr. Tieszen shortly after making this call and told him that, due to

the effects of her medication, she had left a message resigning her job earlier that morning,

which was a mistake.  (Tieszen dep. at 54).  Tieszen told her to call back immediately and

recant her resignation.  (Hatley dep. at 111; Tieszen dep. at 54-55).  After she talked to Tieszen,

the plaintiff called and left another message for Polk stating that she did not want to resign and

that she had made the previous call because of her medication.[10]  (Doc. 33 at Ex. 17).  The

---

[10]There are two versions of the second call in the record.  The one transcribed by someone
in the office of plaintiff's counsel provides as follows:

plaintiff asserts that, due to the effects of her medication, she does not remember leaving these two messages for Polk. (Pl. dep. at 114-16).

Polk listened to both messages and transferred them to Peek. (Polk dep. at 66). A collective decision was then made by Peek, Polk, and Pat Roberts (Peek's superior) to accept the plaintiff's resignation made on the first message without giving effect to the retraction of the resignation contained in the second message. (Polk dep. at 66).[11]

The defendant treated the plaintiff's initial call as a resignation and accepted it, choosing to disregard her subsequent attempts to recant the resignation. Over ten months after she resigned, the plaintiff filed this action, alleging that she had been wrongfully terminated in violation of the ADA and had been denied overtime wages pursuant to the FLSA.

---

Beth, this is Cathy Hatley. I called Dr. Tieszen after I talked to you and everything, and he's gonna call you and talk to you because he had put me on some new medicine yesterday that I had picked up at the pharmacy last night and it knocked me for a loop or whatever, and he was just worried about me. He is with a critically ill patient today and today is his day off so he's going to try to call you today. So, I just wanted to let you know because I was just so upset when my car broke down and you see things whenever you're broken down on the interstate and you don't have your cell phone with you or anything – you don't have any help by any means so, anyway, he's gonna call you, and I'll see y'all tomorrow. And I'm gonna call and make arrangements to get to work. Thank you.

End of message.

(Doc. 33 at Ex. 17).

[11]The plaintiff points out that, after the decision was made to accept her resignation and to disregard her attempt to recant it, Peek was instructed to prepare a report regarding the hours worked by the plaintiff since returning on December 5, 2000. (Peek dep. at 23-25; Doc. 33 at Ex. 8). Such a report had not been prepared before for an employee leaving employment. (Peek dep. at 23).

8

**Facts Related to Plaintiff's FLSA Claim**

During her employment with the defendant, the plaintiff was required to submit time cards in order to certify the hours she worked. (Pl. dep. at 48, 50). She asserts, however, that she worked overtime hours that the defendant did not permit her to include on her time cards. (Pl. dep. at 50-52). She asserts that her supervisors in accounts receivable, Debra Morton and Mike Harper, specifically told her not to submit overtime hours on her time cards because she would not be paid for them. (Pl. dep. at 52). She states that Morton and Harper knew when she was working overtime. (Pl. dep. at 53-54). She also states that three of her co-employees in accounts receivable, Carol Dyer, Carla Cowan, and Margie Young, were also aware that the defendant did not pay overtime hours worked by employees. (Pl. dep. at 54-55). The plaintiff asserts that, on five or more occasions between 1995 and 2001, she was instructed not to submit any overtime hours worked. (Pl. dep. at 60).

The plaintiff alleges, however, that she is unable to recall the exact amount of overtime she worked because of memory-loss associated with her medical conditions. (Pl. dep. at 57). Although she alleges that she recorded all overtime hours worked on her desk calendars, these calendars were retained by the defendant upon her termination and no longer exist. (Pl. dep. at 57). The plaintiff estimated that she worked overtime for approximately four days a week from 1995 to 2000 and was not paid for this overtime. (Pl. dep. at 68-69).

**SUMMARY JUDGMENT STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477

9

U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of

showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party

has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and

show that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.  A dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to

be believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.

Nevertheless, the nonmovant need not be given the benefit of every inference but only of every

*reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir.

1988).

## DISCUSSION

**A.      The ADA Claim**

The plaintiff claims that the defendant violated the ADA by wrongfully terminating her

in January 2001, when she called in to work to report car trouble.  This occurred after she stated

her resignation in a voice mail to the HR Department.

The ADA states that "no covered entity shall discriminate against a qualified individual

with a disability because of the disability of such individual in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a)

(2000). To advance a claim under the ADA, Plaintiff must make a prima facie case establishing

that: (1) she has a disability; (2) she is a "qualified individual," which is to say, able to perform

the essential functions of the employment position she holds or seeks with or without

reasonable accommodation; and, (3) the Defendant unlawfully discriminated against her

because of the disability.[12] *See Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th

Cir. 1999).

### 1. No Adverse Employment Action

The defendant first argues that the plaintiff's ADA claim cannot be premised upon her

termination, since she voluntarily resigned her position by leaving a voicemail message with the

HR department on January 18, 2001, in which she stated, "I'm telling you now that I will not be

---

[12]In the absence of direct evidence of discrimination, the plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases. *See Hilburn*, 181 F.3d at 1226; *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). The plaintiff must establish a *prima facie* case, the defendant will be afforded an opportunity to articulate its purported legitimate, nondiscriminatory reason for its action, and the plaintiff will be allowed to demonstrate pretext. As noted by the court in *Richio v. Miami-Dade County*, 163 F. Supp. 2d 1352, 1359-60 (S.D. Fla. 2001):

. . . . A crucial component in alleging discriminatory treatment by an employer based on conduct proscribed by the ADA, is proof of discriminatory motive. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 325 n.5, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

In establishing unlawful motive, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). . . .

back. And my attorneys will be in touch with you as soon as possible. Thank you very much, and thank you for all your kindness all the [sic] through the years." (Pl. dep. at 106-07, 112-13).

The defendant cites the case of *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1295, 1300 (M.D. Fla. 2002) in support of its argument.[13]  In *MacLean*, the plaintiff resigned, but later attempted to withdraw her resignation, stating that the employer had constructively discharged her.  She later filed a claim against her employer on several bases, including retaliatory discharge.  The court rejected the plaintiff's constructive discharge argument and found that the resignation was voluntary.  *MacLean*, 194 F. Supp. 2d at 1299-1300.  The court further found that because the acceptance of the resignation was within the discretion of the employer, "the failure to accept Plaintiff's rescission of her voluntary resignation was not an adverse employment action in retaliation for Plaintiff's testimony at the Pension Board hearing." *MacLean*, 194 F. Supp. 2d at 1300.  Although *MacLean* is factually distinguishable from the present case, this court is inclined to agree with its analysis.  Where an employee, such as Hatley, voluntarily resigns, the failure to accept her rescission of the resignation is not an adverse employment action.

The plaintiff also argues that she was treated differently from other employees who resigned their employment.  She argues that there were a number of occasions in which defendant employees had quit and been rehired. (Polk dep. at 11-12; Doc. 33 at Ex. 19).  The plaintiff also points out that Polk knew of these incidents at the time she was terminated and

---

[13]*See also Clark v. Dallas Independent School District*, 1996 WL 706866 at *5 (N.D. Tex. Dec. 3, 1999) ("[plaintiff], not [defendant], altered her employment status by resigning before a hearing on [plaintiff's superior's] recommendation [to terminate plaintiff] was held to determine whether the proposed termination or any other adverse action would be taken").

that Polk actually approved the rehire of two such employees. In one instance, the plaintiff

asserts, an employee's termination date was canceled and she was placed on an unpaid leave of

absence after her resignation. (Doc. 33 at Ex. 19). None of these, she asserts, had missed any

time due to a doctor's excuse for health problems or had a doctor request any accommodation

for their work. (Polk dep. at 18).

To the extent that this is an attempt to show the existence of an adverse employment

action, or an attempt to prove the third element of her ADA claim, that she was discriminated

against because of her alleged disability, the defendant points out that the resignation at issue

was actually the plaintiff's second resignation from the defendant's employ. She had previously

resigned in December, 1994, and had been rehired. (*See* Pl. dep. at 30-32, 106-07, 112-13; Doc.

33 at Ex. 3). The defendant argues that none of the purported comparators were rehired after a

*second* resignation, such as that offered by the plaintiff in early 2001. The plaintiff has not

offered evidence disputing this argument. Additionally, the defendant also points out that the

purported comparators did not have the performance problems experienced by the plaintiff.

These are significant distinctions that would prevent the plaintiff from demonstrating that she

was treated differently from similarly situated non-disabled employees or that the acceptance of

her resignation, in spite of her attempt to rescind it, was actually a termination or an adverse

employment action.

## 2.     No Disability Within the Meaning of the ADA

The defendant also argues that the plaintiff cannot establish a prima facie case because

she has not shown that she has a disability within the meaning of the ADA, meaning that she

was disabled, had a record of a disability, or that the defendant perceived her as being disabled.

13

42 U.S.C. § 12012(2); *see* 34 C.F.R. § 104.3(j)(1).

### a.    Plaintiff's Lack of Disability

The defendant argues that the evidence shows that the plaintiff was not disabled – that

she was not prevented or restricted in her ability to perform any of the typical important daily

life activities such as driving, bathing, teeth-brushing, dressing, meal-preparation, feeding

herself or doing laundry. (Doc. 26, Ex. 2 at 7, citing pl. dep. at 190-91). It points out that Dr.

Tieszen concluded that the plaintiff was able to take care of herself and that he did not place any

restrictions on her, except with respect to work prior to December 5, 2000. (Doc. 26, Ex. 2 at 8,

citing Tieszen dep. at 38-39, pl. dep. at 106-07, 112-13). Conditions such as depression can

constitute disabilities. As one court stated,

> Depression, in some circumstances, can be an ADA "disability." *Pritchard v.*
> *Southern Co. Services*, 92 F.3d 1130, 1134 (11th Cir. 1996). There is no question
> that [plaintiff] suffers from relatively serious and occasionally debilitating
> medical conditions. The question is whether these conditions "substantially
> limit" a "major life activity." Major life activities are "functions such as caring
> for oneself, performing manual tasks, walking, seeing, hearing, speaking,
> breathing, learning, and working," 29 C.F.R. § 1630.2(i). They are the activities
> that are "of central importance to daily life, that, for most people, require little or
> no difficulty to perform." *Id. app.* To determine whether these activities are
> "substantially limited," the regulations recommend that the nature and severity of
> the impairment, the duration or expected duration of the impairment, and the
> permanent or long-term impact of the impairment be considered. 29 C.F.R. §
> 1630.2(j).

*Norman v. Southern Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1334 (M.D. Ala. 2002).

The plaintiff has submitted an affidavit stating that she has depression, anxiety, panic

disorder and seizure disorder, which substantially limit her major life activities of driving,

sleeping, concentration, and handling daily stress. (Pl. Aff. at ¶ 4). As the defendant points out,

however, the evidence reflects that, during the time at issue, the plaintiff was able to take care of

14

herself and perform her daily activities.  Although the plaintiff also states that her conditions

also affect her sleep, thinking, and ability to function (Pl. Aff. at ¶ 4), the evidence does not

adequately reflect the sort of severity and permanence of these impairments for the court to

make a finding that such activities are "substantially limited."  The plaintiff emphasizes,

however, that her seizure condition interferes with her ability to drive.  She states that

"[b]ecause I suffer from epileptic seizures, [sic] that cannot be predicted, [sic] and are often not

controllable by medication, it affects many of my daily life activities.  The primary one is

driving since there is a danger in that regard."  (Pl. Dep. at ¶ 4).  The Eleventh Circuit has

found, however, that driving is not a "major life activity" within the meaning of the ADA.  The

court stated as follows:

> Under the ADA a disability is "a physical or mental impairment that
> substantially limits one or more ... major life activities."  42 U.S.C. §
> 12102(2)(A).  Major life activities are enumerated by EEOC regulation as
> "functions such as caring for oneself, performing manual tasks, walking, seeing,
> hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).
> Although this enumeration is not exhaustive, driving is not only absent from the
> list but is conspicuously different in character from the activities that are listed.
> It would at the least be an oddity that a major life activity should require a
> license from the state, revocable for a variety of reasons including failure to
> insure.  We are an automobile society and an automobile economy, so that it is
> not entirely farfetched to promote driving to a major life activity; but millions of
> Americans do not drive, millions are passengers to work, and deprivation of
> being self-driven to work cannot be sensibly compared to inability to see or to
> learn.  *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998);
> *cf. Anderson v. N.D. State Hosp.*, 232 F.3d 634, 636 (8th Cir. 2000).

*Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329-30 (11th Cir. 2001), *cert. denied*, 534

U.S. 1131, 122 S. Ct. 1071, 151 L. Ed. 2d 973 (2002).  The court thus finds that the evidence

presents no genuine issue of material fact regarding whether the plaintiff suffers an impairment

that substantially limits a major life activity, or whether she suffered such an impairment during

the time at issue.

### b.   No Record of Disability/Plaintiff Not Regarded as Disabled

The plaintiff argues that she should be regarded as disabled under the ADA because the defendant regards her as disabled and/or because she has a record of impairment. She points out that the defendant placed her on six months' leave based on her impairments and twice suggested to her that she take long-term disability – once before returning from her six months' leave and once after returning from the leave. In support of this argument, she cites *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1134 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2454, 138 L. Ed. 2d 211 (1997), wherein the court stated that "Pritchard was placed on paid disability leave through November of 1992, and then on unpaid disability leave. This constitutes evidence that Pritchard had a record of being impaired and that SCSI regarded her as being impaired."

The defendant points out that, unlike the plaintiff here, the plaintiff in *Pritchard* had not been released to return to work at the time of the alleged wrongful employment action. A disability, it argues, must be evaluated as of the time of the adverse employment action. (Doc. 34 at 13, citing *Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir. 2000) ("[t]he action that Cash is complaining of occurred in late April and early May of 1998, and we evaluate her disability as manifested at that time"). *See Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir.), *cert. denied*, 528 U.S. 1050 (1999); *cf. Hilburn*, 181 F.3d at 1230 (employer had to know of disability at time of adverse action in order to discriminate)).

The defendant points to evidence that Polk, who accepted the plaintiff's resignation, did not consider her to be disabled or to need accommodation to return to work (doc. 34 at 14,

16

citing Polk dep. at 46-47) and that Peek, the plaintiff's supervisor, had no knowledge of the

reason for the plaintiff's prior absence from work, did not inquire as to the reason and received

no information from plaintiff as to any physical limitations upon her. (Doc. 34 at 14, citing

Peek dep. at 10, 12, 18; Pl. dep. at 91-92). The defendant further argues that knowledge of an

impairment is insufficient to show that a defendant perceived a plaintiff to be disabled; the

impairment must instead be "viewed by the employer as generally foreclosing the type of

employment involved, not just a narrow range of job tasks." *Blackston v. Warner-Lambert Co.*,

2000 WL 122109 at *4 (N.D. Ala. Jan. 26, 2000), citing *Gordon v. E.L. Hamm & Assoc., Inc.*,

100 F.3d 907, 913 (11th Cir. 1996), *cert. denied*, 522 U.S. 1030, 118 S. Ct. 630, 139 L. Ed. 2d

610 (1997).[14]  The evidence does not reflect that the defendant viewed the plaintiff as being

foreclosed from clerical work generally at the time of the alleged adverse employment action.

The plaintiff has not raised a genuine issue of material fact as to whether the defendant regarded

---

[14]As stated above, the defendant offered long-term disability to the plaintiff – once before
she returned to work from her leave and once after she returned from leave. (Doc. 32 at 18-19,
citing Polk dep. at 40-41, 55). The evidence reflects, however, that while the plaintiff was on
leave she conveyed to Polk that her short-term disability leave would be extended from what she
had previously represented; Polk then told her that it would be her responsibility to fill out a
long-term disability application. (Polk dep. at 40-42; Doc. 33 at Exs. 13-14). The defendant's
standard procedure is to send out long-term disability applications to employees after they have
taken 90 days of short-term disability leave, which expires after six months, so the plaintiff
would have gotten such a form. (Polk dep. at 40-41). This appears to be nothing more than a
word of caution to the plaintiff, that she must fill out a long-term disability application if her
leave is to run beyond six months.

The plaintiff also argues that Polk mentioned long-term disability after her return. Polk
testified that she mentioned both this and resignation to the plaintiff as options, in view of the
fact that she had exhausted all her available short-term disability and was still having trouble
performing her duties. (Polk dep. at 55-56). The fact that Polk brought up the possibility of
long-term disability did not mean that she thought that the plaintiff had an impairment that
foreclosed all clerical work, rather than "a narrow range of job tasks." *Blackston*, 2000 WL
122109 at *4.

17

her as disabled.

The court is also unpersuaded by the argument that the plaintiff has a record of a disability merely by virtue of having taken short-term disability leave. As the defendant points out, such reasoning would lead to the untenable conclusion that most people who take short-term disability would be classified as permanently disabled. Nothing in the record demonstrates that the defendant treated her as though she were disabled during the relevant period. Although the plaintiff's prior medical and work history cannot be ignored in the court's consideration, it does not under the present circumstances overcome the motion for summary judgment.

The court is also skeptical that any of the defendant's actions fits adequately into the meaning of a "record of disability." In discussing this term, one court stated as follows:

An individual with a record of disability is a person who "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k) (1998). One purpose of this provision is to prevent discrimination against individuals because of a history of disability. *See* 29 C.F.R. pt. 1630, App. § 1630.2(k) (1998). For example, this provision would protect a former cancer patient from discrimination based on that prior medical history. *See id.* The other purpose is to ensure that individuals are not discriminated against because they have been misclassified as being disabled, such as a person who is erroneously classified as having a learning disability. *See id.*

To establish a claim under the ADA based upon a record of disability, a plaintiff must show that at some point in the past, the employer relied upon a record which either classified or misclassified that individual as having a physical or mental impairment that substantially limits a major life activity. *See Hilburn,* 181 F.3d at 1229. There are several types of records upon which an employer could rely, including education, medical or employment records. *See* 29 C.F.R. pt. 1630, App. § 1630.2(k) (1998).

*Phillips v. Wal-Mart Stores, Inc.,* 78 F. Supp. 2d 1274, 1286-87 (S.D. Ala. 1999), *aff'd,* 220

18

F.3d 593 (11th Cir. 2000). There is no indication that the defendant relied particularly on any record of the plaintiff's impairment. More relevant in this case are the defendant's contemporary observations of the plaintiff's absences and the medical opinions that her doctors addressed to the defendant, and whether those might show that the defendant regarded the plaintiff as disabled. As is stated above, the plaintiff has not raised a genuine issue of material fact in that regard. Summary judgment is therefore due with respect to any claim based upon the defendant's reliance on a "record" of the plaintiffs' disability.

To the extent the plaintiff argues that she has shown that the defendant perceived her as being disabled, the court once again disagrees. To satisfy such a claim, the plaintiff must show that she has a physical or mental impairment that does not substantially limit major life activity but is treated by the defendant as if she did or she has a physical or mental impairment that substantially limits a major life activity only as a result of the attitudes of others toward such impairment. *Todd v. McCahan*, 158 F. Supp. 2d 1369, 1379 (N.D. Ga. 2000). It is not enough that an employer knows that the employee suffers from an impairment to show that there is a perception of disability, nor is it sufficient that the employee informs the employer that the impairment causes difficulties on the job. *Blackston*, 2000 WL 122109 at *4.

The evidence shows that the plaintiff's supervisor, Geraldine Peek, did not review the plaintiff's personnel file and she was not informed by the plaintiff of any physical limitations. As discussed above, there is no evidence that the plaintiff did suffer from an illness that affected a major life activity as to constitute as a disability at the time of her return to work. Additionally, the evidence does not show that the defendant viewed her situation as "foreclosing the type of employment involved, not just a narrow range of job tasks." *Gordon v. E.L. Hamm &*

19

*Associates, Inc.*, 100 F.3d 907, 913 (11th Cir. 1996), *cert. denied*, 522 U.S. 1030, 118 S. Ct. 630,

139 L. Ed. 2d 610 (1997).  To the contrary, the defendant returned her to a position involving

her former duties.  The evidence does not demonstrate that the defendant treated her as though

she were disabled.  The plaintiff has failed to establish the first element of her ADA claim.

Thus, since the plaintiff has not raised a genuine issue of material fact with respect to

whether she was disabled or whether the defendant regarded her as disabled or whether the

defendant relied on any purported record of her disability, the plaintiff's ADA claims must fail

for lack of a necessary element, and summary judgment is due to be granted to the defendant on

that claim.

### 3.     Plaintiff Is Not a Qualified Individual

The defendant argues that the plaintiff is not a "qualified individual" because her

performance was grossly deficient after she returned from leave.  *See Andrews v. United Way of*

*Southwest Alabama, Inc.,* 2000 WL 210694 at *11 (S.D. Ala. Jan. 26, 2000) ("Because the

undisputed evidence overwhelmingly establishes that plaintiff's job performance did not meet

his employer's expectations, this court finds that plaintiff cannot be considered a "qualified

individual with a disability" under the ADA).[15]  The defendant cites Peek's affidavit testimony

---

[15]*See also Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1581-82 (N.D. Ala. 1996)
(plaintiff not a qualified individual under the ADA because she failed to perform job in
accordance with her employer's legitimate expectations for sometime); *Formosa v. Miami Dade*
*Community College*, 990 F. Supp. 1433, 1437 (S.D. Fla. 1997) (plaintiff not qualified for any
available job, because they all required regular attendance and she failed to comply with the
defendant's mandatory requirements for reporting absences); *Howell v. Levi Strauss & Co.*, 840
F. Supp. 132, 135 (M.D. Ga.), *aff'd*, 43 F.3d 680 (11th Cir. 1994) (plaintiff failed to establish that
she was qualified for the position when she failed to meet performance goals and expectations for
all but two weeks of a one-year period, despite being transferred to a less difficult position
wherein she continued to perform well below expected levels for some time).  Although these
cases are factually distinguishable, they are instructive in the present matter.

20

that, in her 22 years as Accounts Payable Expense Supervisor, she had never seen a bookkeeper perform as poorly as did the plaintiff. (Peek dep. at 7, 45-46). She states that the plaintiff failed to meet the minimum requirements of keying entries and had excessive personal telephone calls and personal conversations with others. (Peek dep. at 7, 20, 45-46; Ex. 1).

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The evidence reflects that the plaintiff could not perform the essential functions of the position. The plaintiff protests that she only worked for 15 days of the period after her leave ended, and that this could not have been enough time to judge whether or not she could perform the essential functions of the job. Peek stated that she had sufficient time to make this judgment, however, and the plaintiff offers no evidence to contradict this testimony. (Peek dep. at 35). The plaintiff has not raised a genuine issue of material fact regarding whether she is a qualified individual under the ADA.[16]

---

The plaintiff cites *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000), for the proposition that a plaintiff who has held a position for a significant period of time has the qualifications for that position sufficient to satisfy the test of a prima facie case. *Damon*, however, dealt with an age discrimination claim, in which a court must focus on a plaintiff's "skills and background to determine if they were qualified for a particular position." *Clark v. Coats & Clark*, 990 F.2d 1217, 1227 (11th Cir. 1993). In ADA claims, however, the court must focus on something different: the term "qualified individual with a disability," as it is defined under the ADA--an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The court also notes that the plaintiff's duties in her last position with the defendant differed somewhat from positions she had held before her leave.

[16]Even if the plaintiff had adequately demonstrated that she was qualified premised on her previous experience, summary judgment is still due to be granted premised on the other reasoning set forth herein.

21

As the plaintiff has failed to establish several required elements of her prima facie case under the ADA with respect to her alleged termination, the defendant is due summary judgment with respect to that claim.[17]

### 4.     Defendant's Legitimate, Nondiscriminatory Reason for its Actions

Even if the plaintiff had demonstrated a *prima facie* case, she has not demonstrated that the defendant's legitimate, nondiscriminatory reason for its action, the plaintiff's voluntary termination, is pretext for its unlawful motives.  In *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998), the court stated:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one.  The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted).  The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext).  However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action.  At that point, judgment as a matter of law is unavailable.

---

[17]As the other elements of her ADA claim are unestablished, the court will omit to address the plaintiff's argument as to the last element of the claim – that she was discriminated against on the basis of a disability.

22

In the present case, the plaintiff has not offered "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id*. The plaintiff's arguments that the defendant did not follow its progressive discipline policy and it should have allowed the rescission are unavailing. These arguments ignore the most important fact which is that the plaintiff voluntarily resigned. These arguments do not establish pretext. This is not a discipline situation, it was a resignation. Nothing in the defendant's policies required that they rehire the plaintiff under the circumstances.

## B.    The FLSA Claim

The plaintiff alleges that the defendant violated her rights by failing to pay her overtime wages she was due under the FLSA.

### 1.    Statute of Limitations

The defendant argues that the bulk of plaintiff's claim for overtime wages is barred by the applicable statute of limitations. The FLSA requires that an action alleging unpaid overtime must be commenced within two years after the cause of action accrued. 29 U.S.C. § 255(a), *et seq.*; *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 1115 (1988). The statute is extended to three years if a plaintiff can meet the more onerous requirement of establishing that the violation of the FLSA was "willful." *Id*. Willful violations are those in which "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin*, 486 U.S. at 133 (1988); *Reich v. Dept. of Conservation and Natural Resources*, 28 F.3d 1076, 1084 (11th Cir. 1994). "Willful" is generally understood to refer to conduct that amounts to more than negligence by

23

an employee. *Id.* Although the plaintiff alleged that two supervisors instructed her not to report overtime and that it was generally understood that overtime was not typically reported, she does not offer sufficient evidence of willfulness on the defendant's part to gain an extension of the statute of limitations. (*See* Complaint at ¶ 20; Pl. dep. at 158). The plaintiff does not show that Polk or other upper management employees knew of such allegations. She admits that she did not report them herself.

The plaintiff filed this action on October 31, 2001. (Pl. dep. at 158). Her FLSA claims prior to October 31, 1999, are thus time-barred. The plaintiff claims that she was not paid overtime for hours she worked in the defendant's Accounts Receivable and Fleet Leasing departments. (Pl. dep. at 52, 69, 134; Ex. 21 at ¶ 15). The plaintiff worked the former of these two departments from June 5, 1995, to March 30, 1998, after which she transferred to the Fleet Leasing Department and worked there until May 26, 2000, when she took an extended leave of absence. (Pl. dep. at 37-38, 70-71). As claims arising before October 31, 1999, are time-barred, the FLSA action must rest upon alleged violations taking place from October 31, 1999, to May 26, 2000, a period of a little less than seven months.

## 2. Insufficient Showing that Plaintiff Worked Uncompensated Overtime

To recover under the FLSA for unpaid overtime wages, the plaintiff must show that (1) she worked overtime hours for which she was not compensated and (2) that the defendant had knowledge, or should have known, of the plaintiff's overtime work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946); *Reich*, 28 F.3d at 1082.

As to the first element of this claim, the plaintiff offers only almost no concrete

24

information on when she worked overtime and how much overtime she worked. She argues

that she did not record much of the overtime she worked on her time cards, as per the

instructions of two of her supervisors, Debra Morton and Mike Harper. (Pl. dep. at 52, 56).

Morton and Harper supervised the plaintiff only when she worked in the Accounts Receivable

Department, however, which was before October 31, 1999, so any action based upon an

allegation that Morton and Harper instructed the plaintiff not to put hours on her timecard is

time-barred.[18] The plaintiff also summarily stated that she was not compensated for overtime

she worked in the fleet leasing department, however, and the plaintiff's tenure in that

department lasted approximately 26 months, the last seven of which constitutes the unbarred

time period. (Pl. dep. at 69-71, 133-34).

The plaintiff argues that, since she was allegedly instructed not to record some of the

overtime hours she worked, the court should find that the defendant failed to keep accurate

records of the actual time she worked. (Doc. 32 at 29). Thus, she argues, the court should use

the approximation she offers of how much overtime she worked, and special burden-shifting

rules should apply under *Anderson*, 328 U.S. at 687. (Doc. 32 at 29-30). In *Anderson*, the

employer paid the employees starting on the quarter-hour before they clocked in, and ending on

the quarter-hour before they clocked out. As a result, employees could be unpaid for as much as

56 minutes each day, depending on when they clocked in and out, and the Supreme Court held

that:

---

[18]The court notes that plaintiff's allegations that she was instructed not to record overtime
are stated in vague terms, without any reasonably detailed estimate of when this occurred. (Pl.
dep. at 65, 67, 74). She did profess to recall that Morton and Harper gave her such instructions,
however, and this occurred when she worked in accounts receivable, in the time-barred period.

where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Anderson*, 328 U.S. at 683-84, 687-88.

The Eleventh Circuit has cautioned that *Anderson* should not be read too broadly, however. It stated as follows:

Case law does not, however, support [the plaintiff's] claim that the absence of one week's record and the inaccurate recording of one shift in a year's time constitutes circumstances under which the burden-shifting analysis is applied.

Under [the plaintiff's] interpretation, the burden-shifting analysis would apply every time employers had any error at all in their records. Rather, this circuit has employed the burden-shifting analysis in situations where no records were kept at all or no overtime was recorded. *See, e.g., Amcor, Inc. v. Brock*, 780 F.2d 897, 900 (11th Cir. 1986) (no records kept); *Olson v. Superior Pontiac-GMC, Inc.*, 776 F.2d 265, 267 (11th Cir. 1985) (employer's time records did not correspond with pay periods); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470 (11th Cir. 1982) (employer unable to find "many records" and payroll department employee testified to regularly falsifying records); *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411 (5th Cir. 1975) (no records kept); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 828 (5th Cir. 1973) (employees kept time records but were not permitted to report overtime worked except in rare situations); *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 724 (5th Cir. 1961) (no records kept).

*Etienne v. Inter-County Sec. Corp.*, 173 F.3d 1372, 1376 (11th Cir. 1999).

The only case description cited above that suggests some similarity to the plaintiff's allegations is that of *Brennan*, in which the Secretary of Labor sought to enjoin the defendant from violating the FLSA's overtime and record-keeping provisions and from withholding

unpaid overtime compensation from 26 district representatives, field representatives, and telephone collection personnel, whose job it was to collect overdue accounts and repossess automobiles. The court stated as follows:

> [The employees'] jobs naturally demand long and irregular hours in the field. Because the men work on their own and without direct supervision, GMAC computes their hours worked (and thus wages) by relying on time sheets completed by the employees in the field. The court below found that despite efforts of upper echelon management to encourage accurate overtime reporting, the employees nevertheless understated their overtime because of pressure brought to bear by their immediate [sic] superiors. The trial court found that these supervisors insisted that reported overtime hours be kept to a stated minimum level, thus forcing the employees to work unreported and thus uncompensated hours of overtime.

*Brennan*, 482 F.2d at 827. This case, on the other hand, does not involve employees engaged in unsupervised field work, where overtime abuses could flourish unchecked. Here, there is a central workplace with on-site supervisors. The plaintiff acknowledged, in fact, that some of her supervisors noticed her staying late and instructed her to go home.

The plaintiff has not offered sufficient evidence to demonstrate that the defendant's records are inaccurate or inadequate under *Anderson*. The defendant did keep records of the time plaintiff worked, which records the plaintiff herself prepared and certified as correct by applying her signature thereto. (Pl. dep. at 48-51). Although she alleges that she and other employees were not allowed to report overtime hours worked and that this was common knowledge among the employees, her allegations must be taken in light of other evidence.

As stated above, there are statute of limitations problems with some of the plaintiff's overtime evidence. In addition, the court notes that the plaintiff's testimony is uncorroborated by that of other employees or former employees of the defendant. This lack of corroboration is

27

significant here because the plaintiff's allegations about her overtime are vague.[19] She attributes this vagueness to problems with her memory.[20] Also, the evidence reflects that when supervisors instructed employees that no overtime would be paid, they also typically instructed that the employees should stop working and go home, rather than stay and finish what she was working on. (Pl. dep. at 59-61). Further, the plaintiff admits that many of the times she stayed late or worked through lunch were in order to make up time she had missed working during another part of the day. (Pl. dep. at 83-84, 137-43). In addition, the plaintiff did record and was paid for overtime on occasion. (Pl. dep. at 62-64, 181-88). The court also notes that, at one point, the plaintiff forgot to record some overtime, so she asked a supervisor if it could be added to her recorded time and paid accordingly, which it was. (Pl. dep. at 183-85). In view of all these facts, the court is reluctant to find that *Anderson* is applicable or that the plaintiff has raised a genuine issue of material fact regarding whether she worked uncompensated overtime hours. The defendant's motion for summary judgment is therefore due to be granted with respect to the plaintiff's FLSA claim.

The court finds that the plaintiff has not raised a genuine issue of material fact as to whether the defendant's records were inaccurate or inadequate under *Anderson*. Her vague

---

[19]The plaintiff could name only a couple of other employees she heard receiving similar instructions, but stated "[i]t was more than that but I don't remember who they were." (Pl. dep. at 61). She admitted that she could not give even an approximation of the dates she worked overtime. (Pl. dep. at 65-68). She states that she worked overtime regularly during her time in accounts receivable, but this was from June, 1995 to March, 1998, in the time-barred period. (Pl. dep. at 68-71).

[20]When asked for a month or day on which she might have worked overtime, she replied "[t]o tell you the truth, I cannot think of anything mainly because I can't think of way back whenever thing happened since I've had the seizures. (Pl. dep. at 74).

28

approximation of the amount of unpaid overtime she worked is not a sufficient basis for her FLSA. The court also finds that the plaintiff has not raised a genuine issue of material fact as to whether she worked unpaid overtime in the unbarred time. The defendant's motion for summary judgment is thus due to be granted as to the plaintiff's FLSA claim.

## C.     The Retaliation Claim

In her brief in opposition to the defendant's motion for summary judgment, the plaintiff raises a retaliation claim based on the treatment she allegedly received from the defendant after she requested an accommodation in the form of a less stressful position. (Doc. 32 at 26-28). She argues that, instead of giving her an available position that was relatively low-stress, the defendant instead told her she would need to take the bookkeeping position it had offered her unless she wanted to resign or go on long-term disability. This, the plaintiff argues, shows the defendant's intent to force her out of its workforce. (Doc. 32 at 26-28). She also complains that, because she requested an accommodation, her supervisor subjected her to harassment and the defendant refused to allow her to recant her resignation. (Doc. 32 at 26-28).

The defendant argues that this claim must fail because the plaintiff has not exhausted her administrative remedies with respect to any retaliation claim, that the Charge of Discrimination the plaintiff filed with the Equal Employment Opportunity Commission alleged only disability discrimination and not retaliation. The defendant further complains that no retaliation claims appear on the face of the complaint.

Leaving aside the issue of whether the plaintiff exhausted her administrative remedies with respect to a retaliation claim, the court turns to the defendant's argument that a retaliation claim was not stated in the complaint, and that, by stating such a claim in her brief opposing

29

summary judgment, the plaintiff is attempting to amend the complaint to add a retaliation claim.

With respect to attempts to amend a complaint, one court stated as follows:

> Where a plaintiff seeks to amend its complaint after the defendant has answered,
> it may do so "only by leave of court or by written consent of the adverse party."
> FED. R. CIV. P. 15(a).  Although "[l]eave to amend shall be freely given when
> justice so requires," a motion to amend may be denied on "numerous grounds"
> such as "undue delay, undue prejudice to the defendants, and futility of the
> amendment." *Abramson v. Gonzalez*, 949 F.2d 1567, 1581 (11th Cir. 1992).

*Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000).  The court

notes that the complaint was filed on October 31, 2001, (doc. 1), while the brief in which the

amendment is attempted was filed on November 27, 2002, over a year later.  The court finds

that the gap of nearly 13 months constitutes an undue delay.  It also prejudices the defendant in

that discovery was completed by that time, preventing it from exploring those issues with an eye

to defending a retaliation claim.  The court finds that the plaintiff should not be given leave to

amend the complaint to add a retaliation claim.  The defendant is therefore due summary

judgment on the plaintiff's retaliation claim, as well.

**D.    Claim for Punitive Damages**

The plaintiff also asserts entitlement to punitive damages on both claims.  The defendant

asserts that such damages would be inappropriate because the plaintiff cannot demonstrate that

it acted with malice or reckless indifference.  (Doc. 26 at Ex. 2).  The plaintiff did not respond

to the defendant's arguments in her brief.

Punitive damages are appropriate if the employer acts with "malice" or "reckless

indifference," such that the "employer must at least discriminate in the face of a perceived risk

that its actions will violate federal law. . . ." *Kolstad v. American Dental Association*, 527 U.S.

30

26, 534, 119 S. Ct. 2118, 2124, 144 L. Ed. 2d 494 (1999).

The court agrees with the defendant that even if the claims were allowed to proceed, the evidence is insufficient to support the allowance of punitive damages.

## CONCLUSION

For the reasons set forth above, the undersigned recommends that the defendant's motion for summary judgment (doc. 26) be granted.

**DONE**, this 24th day of September, 2003.

JOHN E. OTT
United States Magistrate Judge

31